CONNECTICUT RESOURCES
RECOVERY AUTHORITY,
Plaintiff,

v.

Kenneth L. LAY, et al., Defendants.
No. 3:02CV2095 (WWE).

United States District Court,
D. Connecticut.

March 17, 2003.

Louis R. Pepe, Thomas J. Rechen, James G. Green, Jr., Richard Harvey Goldstein, Pepe & Hazard, Hartford, CT, Richard Blumenthal, Hartford, CT, Theodore M. Doolittle, Hartford, CT, Chales F. Willson, Pepe & Hazard, Hartford, CT, for plaintiff.

Glenn E. Coe, Brenda M. Hamilton, Rome McGuigan Sabanosh, Hartford, CT, William J. Melley, III, Hartford, CT, Michael Joseph Walsh, Moukawsher & Walsh, Hartford, CT, Garrett S. Flynn, Farmington, CT, Edward J. O'Neill, Jason C. Norwood, Clements, O'Neill Pierce, Wilson & Fulkerson, Houston, TX, Matthew M. Horowitz, Wolf, Horowitz, Etlinger & Case, Hartford, CT, Eliot B. Gersten, Gersten & Clifford, Hartford, CT, Patrick M. Noonan, Michael G. Durham, Steven M. Barry, Delaney, Zemetis, Donahue, Durham & Noonan, Guilford, CT, Kathy D. Patrick, Michael K. Oldham, Brian T. Ross, Aundrea K. Frieden, Gibbs & Bruns, Houston, TX, John F. Conway, Loughlin, FitzGerald, Kamp, Henrici, Molloy, Rizzo & Reed, Wallingford, CT, H. Bruce Golden, Randall C. Owens, Golden & Owens, Houston, TX, John J. McKetta, III, Helen Currie Foster, Graves Dougherty Hearon & Moody, Austin, TX, Ethan A. Levin-Epstein, Jeffrey S. Bagnell, Garrison Levin-Epstein Chimes & Richardson, New Haven, CT, Eliot Lauer, Turner P. Smith, Bernard V. Preziosi, Jr., Curtis, Mallet-Prevost, Colt & Mosle, New York City, Sharon Katz, Davis, Polk & Wardwell, New York City, Samuel Rosenthal, Curtis Mallet-Prevost Colt & Mosle, Washington, DC, J. Daniel Sagarin, Margaret E. Haering, David A. Slossberg, Hurwitz & Sagarin, Milford, CT, Anthony M. Fitzgerald, David S. Hardy, Carmody & Torrance, New Haven, CT, Mark S. Gregory, Kelley Drye & Warren, Stamford, CT, Bruce D. Angiolillo, Thomas C. Rice, Jonathan Youngwood, George S. Wang, Simpson, Thacher & Bartlett, New York City, David P. Atkins, Zeldes, Needle & Cooper, Bridgeport, CT, Richard A. Rosen, Brad S. Karp, Robyn F. Tarnofsky, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Marshall R. King, James L. Hallowell, Gibson, Dunn & Crutcher, New York City, Marc J. Kurzman, Levett Rockwood, PC, Westport, CT, John T. Shaban, Whitman, Breed, Abbott & Morgan, Greenwich, CT, for defendants.

## RULING ON PLAINTIFF'S MOTION TO REMAND

EGINTON, Senior District Judge.

This action arises out of the business failure of the Enron Corporation ("Enron") and its affiliates, specifically as it impacted a $220 million loan made by the plaintiff Connecticut Resources Recovery Authority ("CRRA") to Enron affiliate Enron Power Marketing, Inc. ("EPMI"). CRRA filed

its original twenty-five count complaint in the State of Connecticut Superior Court, Judicial District of Hartford, on October 29, 2002. On November 26, 2002, the defendants Merrill Lynch & Co., Inc. ("Merrill Lynch"), J.P. Morgan Chase & Co. ("J. P. Morgan Chase"), Citigroup, Inc. ("Citigroup"), and Barclay's Capital, Inc. ("Barclay's"), filed a notice of removal of the above-entitled action in the office of the Clerk of the United States District Court for the District of Connecticut.

Pending before the Court is a motion by CRRA to remand to the Connecticut Superior Court, such motion supported by defendants Standard and Poor's Credit Marketing Services ("S & P"), Moody's Investor Services, Inc. ("Moody's"), and Fitch, Inc. ("Fitch"), (collectively, the "rating agencies"). On December 30, 2002, the Judicial Panel on Multi–District Litigation issued a conditional transfer order, transferring this action and several others to the United States District Court for the Southern District of Texas, assigning these actions to the Honorable Melinda Harmon. For the reasons set forth below, the motion to remand (Doc.# 60) will be denied.

*FACTS*

The following facts are taken from the plaintiff's original complaint and motion for remand, which are considered to be true for purposes of ruling on this motion.

The CRRA was established in 1973 by the Connecticut legislature as a quasi-public state agency, created with limited powers specified by statute, to undertake the planning, design, construction, financing, management, ownership, and maintenance of solid waste disposal in the state of Connecticut. CRRA was formed to serve Connecticut municipalities in managing, recycling and disposing of solid waste. Most of Connecticut's 169 towns have voluntarily signed exclusive solid waste management services contracts with CRRA. Under these contracts, the towns are obligated to pay CRRA's operating expenses, and provide the minimum annual tonnages of waste and recyclables to CRRA. CRRA runs several plants that burn solid waste and use the resulting waste heat to generate steam or electricity. Revenues from the sale of steam or electricity are used to defray the per-ton garbage hauling fees ("tipping fees") that CRRA charges its towns.

CRRA is authorized by statute to issue state tax-exempt bonds to construct, operate and maintain its projects. These bonds are secured by the contracts that CRRA has entered into with its member towns, as well as certain other assets owned by CRRA. Using funds derived from the issuance of bonds, CRRA has created several "trash-to-energy" plants where trash collected from member towns is burned to create steam. CRRA's operating expenses with respect to a particular project, as well as the principal and interest payments due on CRRA's bonds, are paid out of the proceeds from the sale of CRRA's electric or steam energy under certain energy purchase agreements, and the per-ton trash tipping fees that are charged to the towns under contracts entered into between the CRRA and each individual town.

CRRA, as part of its mid-Connecticut Project, owned a trash-burning plant that generated steam at South Meadow, in Hartford, Connecticut. The steam was provided to an adjacent electric generating facility owned and operated by the Connecticut Light & Power Company ("CL & P"), where it was converted to electricity. In 1985, CL & P and CRRA entered into a long-term energy purchase agreement (the "1985 EPA") with a term running to May 2012, for the production and sale of steam from the Mid–Connecticut Project. The

1985 EPA required that CRRA sell the steam produced by the mid-Connecticut project to CL & P, and that CL & P convert this steam to electricity. It also required that CL & P pay CRRA for the steam at a rate equivalent to 8.5 cents per kilowatt-hour of energy produced, which was an above-market price compared to the prevailing New England regional wholesale electricity market price.

In 1998, the Connecticut General Assembly passed an energy deregulation law, P.A. 98–28 (the "Deregulation Act"). Under this law, regulated electric companies such as CL & P that had previously owned and operated electric generation, transmission and distribution plants were required to focus on distribution and transmission rather than the generation of power. As a result, CL & P was encouraged by the legislature to divest itself of power generation facilities, and to make good faith efforts to divest itself of contracts to purchase power, including the above-market 1985 EPA, through buyouts, buy-downs, or other restructuring of contractual obligations.

As contemplated by the Deregulation Act, the buy-down of an above-market power purchase contract would entail an up-front lump-sum payment by CL & P to the energy supplier such as CRRA to compensate the supplier for the above-market value of the energy purchase agreement that it was losing. In order to facilitate CL & P's buy-downs and to cover the associated cost to CL & P, the Deregulation Act provided for the issuance of state tax exempt rate reduction bonds to supply the capital needed by CL & P to accomplish the buy-downs. The rate reduction bonds were issued by CL & P Funding, LLC, an entity established by CL & P for this purpose, and were funded by a line item charge on the monthly bills of all CL & P electric customers.

The Connecticut Department of Public Utility Control ("DPUC") approved an issue of more than $1.4 billion in rate reduction bonds for use by CL & P in buying down over a dozen above-market power purchase obligations in Connecticut. Approximately $290 million of this amount was earmarked to buy down the 1985 EPA. The $290 million amount was decreased to $280 million because of a delay in the transaction closing date.

On March 31, 1999, CRRA and CL & P entered into a memorandum of understanding ("MOU"), preliminarily establishing the elements of the buy-down finally entered into, subject to the execution of the final contracts. To satisfy its obligations under the 1985 EPA and complete the buy-down, the MOU contemplated that CL & P would pay approximately $280 million to CRRA to end CL & P's obligation to buy steam from CRRA.

In 2000, before CRRA and CL & P finalized the definitive agreements contemplated by the MOU, Enron became involved in the transaction. As a result, the 1985 EPA between CRRA and CL & P was replaced with a three-way package of transactions involving CRRA, CL & P, and Enron (the "Enron transaction"). Enron was to have no substantive role in this transaction of benefit to CRRA other than to repay a loan and make the deal look like an energy transaction rather than a loan. Enron would receive a substantial cash infusion which it could then show on its financial statements. The result of the CRRA–Enron deal was a loan of $220 million by CRRA to Enron, with a promise by Enron to make fixed monthly payments to CRRA of $2.375 million per month until May 2012. CRRA did not procure any collateral, surety bond, or other risk-management instrument to secure the transaction with Enron, other than a contractual

guarantee by the Enron parent corporation of these payment obligations.

CRRA instructed CL & P to pay $220 million directly to Enron, rather than pay the money to CRRA. Enron began making its monthly payments to CRRA of $2.375 million in April 2001. These payments continued until Enron and EPMI filed for protection under the bankruptcy laws on December 2, 2001. At that time, more than eleven years of payments remained outstanding under the agreements comprising the Enron transaction. No further payments have been made.

On October 29, 2002, CRRA filed this action in Connecticut Superior Court at Hartford, Connecticut. Enron is not among the more than fifty defendants named in the complaint. The complaint alleges *inter alia* that Merrill Lynch, J.P. Morgan Chase, Citigroup, and Barclay's— financial services institutions providing commercial and investment banking services to Enron—helped to structure and finance one or more of Enron's off balance sheet partnerships or so-called "special purpose entities" and helped Enron hide billions of dollars of debt that should have been disclosed on Enron's financial statements.

The complaint also alleges that the defendant Kirkland & Ellis was general outside counsel to various partnerships and special purpose entities established by Kirkland and Ellis at the direction of Enron, and that Kirkland & Ellis knew that these entities were not independent from Enron, but were established and designed by Enron to falsely portray Enron's financial strength.

CRRA's twenty-five count complaint is based solely on alleged violations of Connecticut law, including the Connecticut Unfair Trade Practices Act ("CUTPA"), C.G.S. §§ 42–110a, et seq, and the Connecticut common law. CRRA asserts that none of the claims asserted by the CRRA in its complaint is based upon, arises under, nor is related to federal law. In addition, CRRA has requested a jury trial.

On November 26th and 27th, 2002, five of the more than fifty defendants filed notices of removal under 28 U.S.C. §§ 1334(b), 1441, 1446, and 1452, contending that this Court has original jurisdiction over this action. Specifically, in their notice of removal, the five defendants have advanced two purported bases for federal jurisdiction.

First, the five defendants contend that the legal and factual issues underlying this case are related to the legal and factual issues to be adjudicated in Enron's bankruptcy under Chapter 11 of the United States Bankruptcy Code. They further contend that this matter is related to the Enron bankruptcy action because Enron may owe contribution or indemnification to some of the removing defendants, in the event a judgment is rendered for the plaintiff in this action, thereby reducing the amount of the Enron bankruptcy estate and thus conferring jurisdiction on this Court under 28 U.S.C. §§ 1334(b) and 1452.

Second, the defendants argue that this Court has original jurisdiction under 28 U.S.C. §§ 1334(b) and 1452 because the claims or causes of action are related to the adversary proceeding between the CRRA and Enron pending in the Enron bankruptcy action and that the factual and legal issues in this matter are related to the factual and legal issues to be adjudicated in the CRRA–Enron matter.

## DISCUSSION

 On a motion to remand, the court construes all factual allegations in favor of the party seeking the remand. *Metropolitan Property & Casualty Ins. Co. v. J.C. Penney Casualty Ins. Co.*, 780 F.Supp.

885, 887 (D.Conn.1991). Moreover, it is well settled that defendants, as the parties removing the action to federal court, have the burden of establishing federal jurisdiction. *Wilson v. Republic Iron & Steel Co.,* 257 U.S. 92, 97, 42 S.Ct. 35, 66 L.Ed. 144 (1921). Unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). This presumption in favor of the plaintiff's choice of forum is especially important when the defendant resides in the chosen forum. *Florian v. Danaher Corp. and Snap–On Tools Co.,* 2001 WL 1504493, *2 (D.Conn.2001).

In the present case, the CRRA makes the argument that this case is unrelated to the bankruptcy proceeding, and consequently, that the Court does not have jurisdiction over this matter. Specifically, CRRA is asserting that Enron holds its $220 million in a constructive trust for CRRA, and if this argument is successful, CRRA asserts that the constructive trust claim will result in a judicial declaration that the $220 million was never Enron's property, and is not part of the bankruptcy estate. Moreover, CRRA states that under long-standing case law, bankruptcy-related removal is not available unless every codefendant has joined in or consented to the notice of removal, under the "rule of unanimity." Finally, CRRA states that the Court is required to abstain under the mandatory abstention provision of §§ 1334(c)(2). Barring that, CRRA asserts that the Court should abstain under the permissive abstention provision of § 1334(c)(1).

*Subject Matter Jurisdiction*

■ By not naming Enron as a party in its complaint, CRRA attempted to insure that the case would be litigated in the state court system, and not be removed from state court to federal court as an action "related to" a bankruptcy. A recent ruling by the Southern District of New York in the WorldCom case is remarkably on point. In *New York City Employees' Retirement System, et al., v Ebbers, et al. (In re WorldCom, Inc. Sec. Litig.),* 293 B.R. 308, 2003 WL 716243 (S.D.N.Y.2003), that court addresses many of the concerns presently set forth by CRRA. In that action, as here, the plaintiffs originally filed in state court and did not state claims against WorldCom, which had filed for bankruptcy several months earlier. There, as here, the defendants removed the action to the federal court on the basis of the litigation's relationship to the WorldCom bankruptcy. The plaintiffs moved to remand the action back to state court, citing lack of subject matter jurisdiction.

The *WorldCom* ruling cited *Celotex Corp. v. Edwards,* 514 U.S. 300, 308, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995), where the Court agreed with the views expressed by the Third Circuit Court of Appeals regarding jurisdiction under 28 U.S.C. § 1334(b) in its decision in *Pacor, Inc. v. Higgins,* 743 F.2d 984 (3rd Cir.1984), and set out the elements of the *Pacor* test for determining the existence of "related to" jurisdiction in a footnote:

The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy . . . .* Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way im-

pacts upon the handling and administration of the bankrupt estate. *Id.* n. 6.

In the present action, the outcome of the case would most assuredly affect the bankrupt estate. The CRRA is attempting to declare that the $220 million in question is not a part of the bankruptcy estate but is held in constructive trust for CCRA. Under *Celotex*, applying the *Pacor* test, the Court is justified in recognizing "related to" jurisdiction.

*Unanimous Consent to Removal*

■ CRRA asserts that unanimous approval is required for a case to be removed to federal court, pursuant to 28 U.S.C. § 1452, and that the defendants are attempting to skirt the rule of unanimity in removal cases by arguing that their removal is bankruptcy-related. Section 1452 states in pertinent part that (a) a party may remove any claim or cause of action in a civil action ... to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title; and (b) the court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground. An order entered under this subsection remanding a claim or cause of action, or a decision to not remand, is not reviewable by appeal or otherwise by the court of appeals ... or by the Supreme Court of the United States ....

Because the Court has determined it has jurisdiction under 28 U.S.C. 1334(b), consent for removal by all defendants is not required.

*Mandatory and Discretionary Abstention*

CRRA asserts that even assuming for the purposes of argument that its state law claims are "related to" the Enron bankruptcy and that this Court could assume jurisdiction over this matter, the Court should nonetheless abstain from hearing this matter pursuant to the mandatory abstention provisions under 28 U.S.C. § 1334(c)(2), or in the alternative, the permissive abstention provisions under 28 U.S.C. § 1334(c)(1).

■ Section 1334(c)(1) states that "nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11"; and (c)(2) states that "upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." The court in *WorldCom* held that "a party seeking mandatory abstention must prove each of the following": (1) the motion to abstain was timely; (2) the action is based on a state law claim; (3) the action is "related to" but not "arising in" a bankruptcy case or "arising under" the Bankruptcy Code; (4) Section 1334 provides the sole basis for federal jurisdiction; (5) an action is commenced in state court; and (6) that action can be "timely adjudicated" in state court. "A party is not entitled to mandatory abstention if it fails to prove any one of the statutory requirements." *In re WorldCom, Inc. Securities Litigation* at 331, 2003 WL 716243 at *18.

■ CRRA has failed to meet its burden on one of the statutory requirements. CRRA's proof that the action could be timely adjudicated in state court consists

472

of a statement that this is so, without addressing the ramifications of the size and complexity of the litigation, and the judicial inefficiency of litigating common issues in courts across the country. The Court will not invoke mandatory abstention under § 1334(c)(2).

CRRA goes on to assert that if the Court were to decline to abstain pursuant to the mandatory provisions of § 1334(c)(2), the Court should abstain under the permissive abstention provision of § 1334(c)(1), "in the interest of justice, or in the interest of comity with State courts or respect for State law." For the pending motion to remand, the Court adopts as its own the following language from the *WorldCom* ruling: "It is beyond cavil that judicial economy and efficiency are best served by exercising the jurisdiction that so clearly exists. The MDL panel has consolidated scores of cases before this Court to promote the expeditious and efficient resolution of the claims arising from the collapse of [Enron] ... With the consolidation of the litigation in one court, the motion practice and discovery process can be managed to protect the rights of all parties and to preserve, to the extent possible, the maximum amount of assets for recovery by plaintiffs with meritorious claims ... In contrast, if this Court were to abstain pursuant to Section 1334(c)(1) and remand the litigation originally filed in state court, motion practice and discovery would proceed in many jurisdictions. The litigation that would ensue in the various fora would be entirely duplicative and wasteful ... A remand would encourage a race for assets, a race that may deprive many victims of the alleged fraud of their fair share of the recovery." *Id.* at 333–334, 2003 WL 716243 at *20. In the interest of justice, the Court will deny CRRA's motion to remand to Connecticut Superior Court.

*CONCLUSION*

For the reasons set forth above, CRRA's motion for remand (Doc.# 60) is DENIED.